UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ZAP'S ELECTRICAL, LLC, a foreign limited liability company,

Plaintiff,

vs.

MONARCH CONSTRUCTION, LLC, a Nevada limited liability company,

Defendant.

3:19-cv-00603-RCJ-CLB

ORDER

The parties have filed competing motions for summary judgment on all claims and counterclaims. The Court finds that a jury could disagree with Plaintiff's version of the material facts and thus denies the motion. Defendant filed its motion nearly three weeks after the deadline pursuant to the Court's scheduling order. As such, Plaintiff moves to strike that Defendant's motion. The Court agrees with Plaintiff and strikes Defendant's motion for summary judgment.

**FACTUAL BACKGROUND**

In mid-2017, Digney York and Associates, LLC ("Digney"), a general contractor company that specializes in hotel construction and renovation, was hired to oversee two hotel renovations in Reno, Nevada. The projects were for the El Dorado Hotel & Casino ("El Dorado Project") and for the Circus Circus Hotel & Casino ("Circus Project" and collectively "the Projects"). For the

electrical work of the Projects, Digney sought the help of Plaintiff, who is an electrical subcontractor LLC based in Rhode Island that has previously worked with Digney.

At this time, Plaintiff did not have any contractor's licenses in Nevada. It began the process of becoming licensed in Nevada to perform electrical work in January 2018. (*See* ECF No. 64 Ex. B ¶ 8.) On March 9, 2018, Plaintiff finished its registration to do business in Nevada as a foreign LLC. (ECF No. 64 Ex. A.) The Nevada State Contractor's Board ("NCSB") eventually issued Plaintiff a license over a year later on April 15, 2019. (ECF No. 64 Ex. C.)

Since it was not yet licensed in Nevada, Plaintiff—through its manager, Mr. Brian Snow—posted a solicitation for Nevada licensed electricians to assist with the work on Craigslist.org. (ECF No. 59 Ex. A ¶ 9; *see* ECF No. 59 Ex. A-1.) On December 6, 2017, Defendant responded to this solicitation, sending the following email, in pertinent part: "My name is Arthur Johnson and I am managing member of [Plaintiff.] We hold several NV contractor licenses electrical C-2 being one. I would like to talk to you and see if there is anything we can work out." (ECF No. 59 Ex. A-1.)

The parties then engaged in negotiations with each other regarding the entry of a bid for the Projects. (*See, e.g.*, ECF No. 59 Ex. A-3.) Plaintiff and Defendant agreed that the work for the Circus Project was to begin first. (ECF No. 64 Ex. A ¶ 11; ECF No. 60 Ex. 2 ¶ 4.) Defendant contends the parties entered into a contract for the work to be performed for the Circus Project but not the El Dorado Project. (ECF No. 60 Ex. 2 ¶ 4–7.)

Mr. Snow, on the other hand, attests the parties successfully entered into contracts for both projects, wherein Plaintiff would submit bids to be the subcontractor under Digney as the general contractor and Defendant would be a sub-tiered subcontractor under Plaintiff. (ECF No. 64 Ex. A ¶¶ 11–17.) Plaintiff submits a two-page document, regarding the Projects, containing details of an arrangement between the parties, such as labor and fees as well as a description of how the labor

would be divided among the parties. (ECF No. 59 Ex. A-6.) This document does not contain a place for a signature and does not bear one. (*Id.*) It contains the following summary of the labor:

> [Defendant] will pull permit for the electrical renovations at the El Dorado Reno located at 345 N Virginia St, Reno Nevada 89503.
> [Plaintiff] will be responsible to pay for the permit fees
> [Plaintiff's] employees will be working directly for [Defendant], as such [Plaintiff] will be responsible to pay all associated costs for these employee wages for the El Dorado Project. These Fees include the following
>     : Payroll Expenses
>     : Tax Liabilities
>     : Workers Comp Liabilities
>     : General Liability expenses associated with [Plaintiff's] added payroll
>     : Other state or federal employee or employer expenses directly related to [Plaintiff's] Payroll running through [Defendant].
> Arthur Johnston [sic] agrees to be onsite for all required electrical inspections free of charge, in return for Brian Snows [sic] onsite time at the Circus Circus Reno project that [Defendant] is performing work on. Brian was onsite for the kick off of the project at circus circus and will remain available to help guide [Defendant] through different questions, concerns, change orders or other events that may arise. Brian's time for this onsite time will not be billed at the above hourly rate. Brian's 10% contract payment for the circus circus project serves as his payment for all intellectual and computer / contract work Brian provides onsite to assist [Defendant] through the project.
> [Plaintiff] will Open a ADP account on behalf of [Defendant] for the purpose of payroll payments to the [Plaintiff's] Employees and payroll liabilities.

(*Id.*) Plaintiff has also submitted an unsigned subcontract form containing details of the work for the Circus Project dated January 28, 2018. (ECF No. 64 Exs. A-8.) Defendant has provided the Court the email in which Plaintiff's Exhibit A-6 was provided to it; it reads: "So here is a draft of an agreement between us for the labor rates, etc.. [sic] Let me know or add items you may want and lets [sic] get this worked out." (ECF No. 60 Ex. 1.)

On February 20, 2018, Defendant emailed Plaintiff several documents with the following titles, "Executed signature page of the contract (also the payment page, in NV the maximum retainage is 5%)," "W9," "Voided check for direct deposit," "Auto Cert," "Liability Cert," "WC Cert," and "Umbrella Cert." (ECF No. 64 Ex. A-9.) Plaintiff has not provided these documents, but only the email that lists them as attachments.

According to Mr. Snow's testimony, Plaintiff submitted Digney bids for the Projects and was awarded both. (ECF No. 59 Ex. A ¶¶ 13.16.) As evidence of these awards, Plaintiff has attached unsigned subcontract forms between Digney and Plaintiff, but neither is signed. (ECF No. 59 Exs. A-4, A-7.) The Circus Project was to commence on February 10, 2018. (ECF No. 59 Ex. A-4.) The El Dorado Project was to commence on March 13, 2018. (ECF No. 59 Ex. A-7.)

Shortly after the work began, in March, 2018, NCSB issued a cease-and-desist directive closing all of the work down on the Projects. (ECF No. 60 Ex. 2 ¶ 6; *see* ECF No. 59 Ex. A-10 (email from Digney to Plaintiff noting NCSB's objection to Plaintiff being unlicensed.) Defendant and Digney were fined for contracting with Plaintiff, while it was not licensed to perform electrical work in Nevada at the time. (ECF No. 60 Ex. 2 ¶ 8; Nevada State Contractor's Board, *License Details*, https://app.nvcontractorsboard.com/Clients/NVSCB/Public/Shared/Details.aspx?EntID=3950896&LicNum=309133 (noting that Defendant was fined for violating Nev. Rev. Stat. § 624.3015(4) Knowingly entering into a contract with a contractor who is not licensed); Nevada State Contractor's Board, *License Details*, https://app.nvcontractorsboard.com/Clients/NVSCB/Public/Shared/Details.aspx?EntID=4311853&LicNum=314995 (noting that Digney was fined for violating same). Defendant then executed subcontracts with Digney itself without Plaintiff being on the contracts. (ECF No. 60 Ex. 2 ¶ 8; ECF No. 59 Exs. A-11, A-12.)

The work proceeded with Defendant being the subcontractor and hiring many of Plaintiff's employees. (ECF No. 60 Ex. 2 ¶ 9.) With the higher status of subcontractor, Defendant was required to pay an extra $11,377.16 in insurance premium. (*Id.* ¶ 21.) Ultimately, the work was completed under this arrangement.

After the work's completion, Plaintiff and Defendant began disputing the split of their payment. Plaintiff argued that Exhibit A-6 was the controlling agreement between the parties in spite of the facts that NSCB determined that arrangement was illegal and that Defendant subsequently

assumed a greater responsibility of the Projects. Defendant retained ten percent of the payout of the El Dorado Project (which is approximately $90.996.70),[1] which was not contained in the Exhibit A-6 split of costs. Plaintiff has maintained this position and seeks $90.996.70 from Defendant in this instant action.

Defendant counters they never agreed upon Exhibit A-6 as a binding contract and, even if they did, it argues that honoring that arrangement would be illegal and subject it to further fines by NSCB. Defendant argues that Plaintiff was no longer involved after NSCB's objection, so it claims that it is entitled to money that Plaintiff received from Digney that it has refused to remit to Defendant as the subcontractor as opposed to the sub-tiered subcontractor. For remission of these funds, Defendant raises counterclaims.

## LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v.*

---

[1] In an email, Defendant stated that it would retain ten percent of the El Dorado fee. (ECF No. 59 Ex. A-13.) A spreadsheet of the costs indicates that Defendant charged $909,967. (ECF No. 59 Ex. A-16.) Ten percent of this figure would be the $90.996.70 figure that Plaintiff posits.

1  *Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts

are only viewed in the light most favorable to the non-moving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

**ANALYSIS**

*I.     Motion to Strike*

The Court begins its analysis by addressing Plaintiff's Motion to Strike. (ECF No. 65.) In it, Plaintiff complains that Defendant's Motion for Summary Judgment (ECF No. 63) is untimely without leave of Court, so it should be stricken from this record according to the local rules. The Court agrees.

Defendant's Motion for Summary Judgment was filed on December 29, 2020.[2] This was after the latest scheduling order mandated such motions need to be filed by December 9, 2021. (ECF No. 58.) Defendant filed his motion for summary judgment almost three weeks late without seeking leave of this Court. In response to Plaintiff's motion, Defendant argues its untimeliness should be excused because of Plaintiff's admissions in its Motion for Summary Judgment and generally courts favor summary judgment motions to save resources. These arguments are unavailing. *Igbinovia v. Catholic Healthcare West*, No. 2:07–cv–01170–GMN, 2011 WL 3424591, at *2 (D. Nev. Aug. 4, 2011) ("[A]ny dispositive motion filed after the deadline in the scheduling order . . . can be denied solely on the ground that it was untimely.") (citing *Johnson v. Mammoth*

---

[2] Defendant filed his response to Plaintiff's Motion for Summary Judgment on December 29, 2020 titled "Opposition to Motion for Summary Judgment and Cross Motion for Summary Judgment." (ECF No. 60.) Then, he made another filing titled, "Cross Motion for Summary Judgment" on December 30, 2020, which merely attached the former filing for all of its argumentation. (ECF No. 63.) For purposes of the motion to strike, the Court will use the December 29, 2020 to date this filing.

*Recreations, Inc.*, 975 F.2d 604, 608–69 (9th Cir. 1992)). The Court grants Plaintiff's motion and strikes Defendant's Motion for Summary Judgment.

## II. *Plaintiff's Motion for Summary Judgment*

Turning to the merits of the case, the Court now considers Plaintiff's Motion for Summary Judgment. For Plaintiff to succeed, it must first show the alleged arrangement in Exhibit A-6 between the parties was—and still is—an enforceable agreement. The Court finds whether this exhibit constituted a part of the agreement between the parties is subject to a genuine issue of material fact.

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005). "A meeting of the minds exists when the parties have agreed upon the contract's essential terms." *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 255 (Nev. 2012) (citing *Roth v. Scott*, 921 P.2d 1262, 1265 (Nev. 1996)). Whether terms are essential "depends on the agreement and its context and also on the subsequent conduct of the parties, including the dispute which arises and the remedy sought." Restatement (Second) of Contracts § 131 cmt. g (1981).

Plaintiff contends Defendant agreed to the terms contained in Exhibit A-6 through its acceptance of the Exhibit A-8 and through its actions by initially performing the work in accordance with Exhibit A-6. While a contract may be accepted through one's actions, *see, e.g.*, *Tropicana Hotel v. Speer*, 692 P.2d 499, 502 (1985), whether Defendant did so is subject to a genuine issue of material fact. The only communication shown in regards to Exhibit A-6 is an email from Plaintiff, which reads, "So here is a draft of an agreement between us for the labor rates, etc.. [sic] Let me know or add items you may want and lets [sic] get this worked out." (ECF No. 60 Ex. 1.) Plaintiff has not presented further communications of the parties such that this Court can determine

///

that no reasonable juror would find the parties agreed to the terms of Exhibit A-6. This conclusion necessitates that the Court deny Plaintiff's motion for summary judgment.

Additionally, even if Exhibit A-6 constituted agreed upon terms, Defendant argues that Plaintiff's involvement in the work was illegal because Plaintiff did not have a license in Nevada so all of the contracts involving Plaintiff regarding the Projects are void ab initio and therefore unenforceable. Plaintiff agrees that the contracts were illegal but raises two narrow exceptions by which it may still collect the allegedly agreed upon proceeds: substantial compliance and the *Magill* test (by which a court may enforce an illegal contract).

Chapter 624 of Nevada Revised Statutes provides the licensing laws for contractors in Nevada. The statutes provide:

> No person, firm, copartnership, corporation, association or other organization, or any combination of any thereof, engaged in the business or acting in the capacity of a contractor shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that such person, firm, copartnership, corporation, association or other organization, or any combination of any thereof, was a duly licensed contractor at all times during the performance of such act or contract and when the job was bid.

Nev. Rev. Stat. § 624.320. While this language is absolute, the Nevada Supreme Court has read in an exception where there is substantial compliance with the statutes. This exception has been repeatedly characterized as a narrow one. *See, e.g.*, *Eagle Rock Contracting, LLC v. Nat'l Sec. Techs., LLC*, No. 2:14-CV-01278-GMN-NJK, 2017 WL 372977, at *3 (D. Nev. Jan. 25, 2017).

In *Nevada Equities v. Willard Pease Drilling Co.*, 440 P.2d 122 (Nev. 1968), a drilling company that held a contractor's license for oil and gas well drilling and a second license for water well drilling was permitted to maintain a suit for the balance owed on a contract to drill for mineral water, even though it did not hold a specialty license from NSCB. The *Nevada Equities* court held that the drilling contractor had "substantially complied" with the Nevada licensing scheme, since

it possessed the general licenses and evinced no signs of financial or technical inadequacy. 440 P.2d at 123. Similarly, in *Day v. West Coast Holdings, Inc.*, 699 P.2d 1067 (Nev. 1985), the court held that a landscaper subcontractor could enforce a contract with a general contractor, since the landscaper held a general contractor's license and had informed the general contractor that its application for a specialty license was pending.

In *MGM Grand Hotel*, the Ninth Circuit, while applying Nevada law, held that an owner, who had not been licensed as a contractor and had solely undertaken the financial responsibility of the building project, had nevertheless substantially complied with the Nevada licensing scheme. There, the court held that the owner's delegation of all day-to-day supervision of construction work to a licensed general contractor and its avoidance of any appearance of financial irresponsibility satisfied the Chapter 624 requirements. *MGM Grand Hotel, Inc. v. Imperial Glass Co.*, 533 F.2d 486, 489–90 (9th Cir. 1976).

Plaintiff failed to substantially comply with the statutes. While Plaintiff did have licenses in other states, it did not have any in Nevada unlike *Day* and *Nevada Equities, Inc.* Unlike *MGM Grand Hotel*, Plaintiff neither owned the constructed properties nor functioned as a passive financier. In sum, no case applying Nevada law has extended the substantial compliance doctrine as far as Plaintiff seeks to stretch it. This Court likewise declines to expand the narrow doctrine here.

Plaintiff also relies on *Magill v. Lewis*, 333 P.2d 717 (Nev. 1958). In this case, the Nevada Supreme Court found that an illegal contract could still be enforceable where the following four-factor test weighs in favor of such enforcement:

> [1] the public cannot be protected because the transaction has been completed, [2] where no serious moral turpitude is involved, [3] where the defendant is the one guilty of the greatest moral fault and [4] where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.

*Id.* at 719.

Applying the factors here, the Court finds that the general rule—that an illegal contract is unenforceable—should not be altered here. The first and second factors favor enforcement as the work has been completed and there is no serious moral turpitude involved. As for the third factor, the Court does not find that Defendant is at greater moral fault than Plaintiff. Additionally, the Court does not find that Defendant would be unjustly enriched if the Court does not enforce the contract. While Defendant did get more money than envisioned in Exhibit A-6, it incurred more risk, more responsibility, and more fees as the subcontractor as opposed to working under Plaintiff. The Court accordingly does not find that Plaintiff has carried its burden for summary judgment.

Furthermore, neither exception can apply where the violations were "blatant, substantial, and repeated." *Loomis v. Lange Fin. Corp.*, 865 P.2d 1161, 1165 (Nev. 1993). While Plaintiff may have innocently began working on the Projects thinking that its application for license and partnering with licensed contractors was sufficient, that cannot be true after NSCB informed them of the violations early into the work process. Plaintiff's continued involvement in the Projects raises to the level of blatant, substantial, and repeated.[3] As such, neither excuse could apply to work performed after NSCB's notice.

///

///

///

///

---

[3] Plaintiff appears to argue that by taking its name off of the contracts and having Defendant work directly with Digney, Plaintiff would avoid violating Chapter 624 through its indirect involvement. This is plainly incorrect. As NSCB already decided, Digney and Defendant could not contract with Plaintiff to perform the work under Nev. Rev. Stat. § 624.3015(4). Chapter 624 is not so narrow as to merely outlaw direct contracts for the work that needs to be performed by licensees; it further outlaws work performed "by or through others." Nev. Rev. Stat. § 624.020; *see Interstate Com. Bldg. Servs., Inc. v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 23 F. Supp. 2d 1166, 1172 (D. Nev. 1998) (finding a blatant, substantial, and repeated violation for indirect involvement).

**CONCLUSION**

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (ECF No. 59) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (ECF No. 63) is STRICKEN.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike (ECF No. 65) is GRANTED.

IT IS SO ORDERED.

Dated September 29, 2021.

_____
ROBERT C. JONES
United States District Judge