# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

ZAP'S ELECTRICAL, LLC,

Plaintiff,

v.

MONARCH CONSTRUCTION, LLC,

Defendant.

Case No. 3:19-CV-00603-CLB

**ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND MOTION TO AMEND JUDGMENT TO INCLUDE INTEREST**

[ECF Nos. 148, 153]

This case involves an action filed by Plaintiff Zap's Electrical, LLC ("Zap's") against Defendant Monarch Construction ("Monarch"). Currently pending before the Court are two motions filed by Zap's. First, Zap's filed a motion for attorney's fees, (ECF No. 148.) Monarch responded, (ECF No. 149), and Zap's replied. (ECF No. 152.) Second, Zap's filed a motion to amend the judgment to include interest. (ECF No. 153.) Monarch responded, (ECF No. 154), and Zap's replied. (ECF No. 155.) For the reasons stated below, the Court grants Zap's motion for attorney's fees and motion to amend the judgment to include interest.

## I.   FACTUAL BACKGROUND[1]

This dispute stems from alleged contracts between Zap's and Monarch related to construction work which occurred when Zap's was not a licensed contractor in the state of Nevada. Initially, Zap's contracted with Monarch to perform electrical work on projects at the Circus Circus Hotel and Casino and El Dorado Hotel and Casino for general contractor Digney York. Shortly after beginning the work, the Nevada contractor's board shut down the construction and fined the parties because Zap's was not a licensed contractor. Following the shutdown by the contractor's board, construction restarted and was completed. Ultimately, the parties disagreed over how the money earned from the El

---

[1]   The background facts provided are based on facts stipulated to by the parties and evidence presented at trial. (ECF No. 141 at 13; *see generally* ECF No. 150.)

Dorado project should be distributed.

In its complaint, Zap's alleged three claims for relief: (1) breach of contract; (2) promissory estoppel; and (3) unjust enrichment. (ECF No. 22.) As to the first claim, Zap's alleged Monarch breached a contract between the parties by refusing to pay Zap's the full amount upon completion of the construction project. (*Id*. at 3.) Next, Zap's alleged it is entitled to recoup the reasonable amount of benefits obtained by Monarch based on promissory estoppel because of Zap's detrimental reliance on Monarch's promise to pay for work completed. (*Id*. at 4.) Finally, Zap's alleged Monarch inequitably retained the payment for completing the project and Zap's is entitled to recoup the reasonable amount of benefits obtained by Monarch based on the doctrine of unjust enrichment.

Thereafter, Monarch filed its answer and asserted counterclaims against Zap's for: (1) breach of contract; (2) unjust enrichment; (3) promissory estoppel; and (4) conversion. (ECF Nos. 8, 15.) Monarch's first counterclaim alleged Zap's breached a contract between the parties by failing to pay Monarch after Monarch performed under the contract. (*Id*. at 4-5.) Monarch's second counterclaim alleged Zap's received benefits which were due to Monarch and which Monarch is entitled to recover to prevent unjust enrichment of Zap's. (*Id*. at 5-6.) Next, Monarch alleged it was entitled to a portion of the proceeds from the construction work in connection with the work performed by both parties under the theory of promissory estoppel. (*Id*. at 6-7.) Finally, Monarch alleged Zap's was not entitled to any of the proceeds from the construction work and therefore, by keeping the funds, converted the proceeds to the exclusion of Monarch. (*Id*.)

On September 9, 2021, the district court entered an order ruling on the parties' competing motions for summary judgment and Zap's motion to strike. (ECF No. 68.) In the order, the district court granted Zap's motion to strike Monarch's motion for summary judgment as it was filed "nearly three weeks after the deadline." (*Id*.) As to the merits of Zap's motion for summary judgment, the district court determined there was genuine issue of material fact existed with respect to whether a contract existed. (*Id*. at 8-9.) The district court then considered Monarch's argument that even if a contract did exist, the

contract was illegal pursuant to NRS 624.320 because Zap's was not a licensed contractor in the state of Nevada at the time the agreement was formed. (*Id*.) Although Zap's conceded the contract between the parties was illegal, Zap's argued two exceptions applied through which Zap's could still recover under the terms of the contract: substantial compliance and the Magill test. (*Id*.) The district court determined that neither exception applied and therefore denied Zap's motion for summary judgment. (*Id*.)

After the case was set for trial, Monarch filed a document entitled a "Memorandum" in support of its statement of the case. (ECF No. 110.) In this memorandum, Monarch raised – for the first time – the issue of whether the district court's order related to Monarch's motion for summary judgment was binding as law of the case and precluded Zap's claims from being presented to the jury. (*Id*.) Accordingly, the Court ordered the parties to submit supplemental briefing on the issues raised by Monarch's memorandum in order to determine what, if any, claims could proceed to trial. (ECF No. 119.) Specifically, the Court ordered to the parties to brief:

(1) Whether the district court's order, (ECF No. 68), is law of the case, and, if so, whether the factual findings in that order are binding; and

(2) Whether, despite those decisions appearing to be legal decisions, such decisions can be presented to the jury.

(*Id*.) At the hearing where the Court ordered this briefing, Monarch argued its counterclaim for breach of contract was based on a separate, second contract between the parties. (*Id*.)

After full briefing, the Court first found that because the district court's order, (ECF No. 68), was a denial of summary judgment for the plaintiff, the order did not bind the Court as the law of the case. (ECF No. 123 at 7 (citing *Fred Segal, LLC v. CormackHill, LP*, 821 F. Appx 783, 786 (9th Cir. 2020).) Next, the Court determined that there were questions of fact for a jury and therefore Zap's claims should proceed to trial. (*Id.* at 7-8.) Regardless of whether Zap's claims were precluded by the district court's order, (ECF No. 68), the Court specifically noted that because Monarch affirmatively represented that

its counterclaims are based on a separate contract, those claims would also have to proceed to trial. (*Id.* at 8 (citing ECF No. 119).) The Court therefore concluded that as a matter of judicial economy, proceeding as to both Zap's claims and Monarch's counterclaims in the same trial was prudent because a trial on any alleged separate contract would involve the same parties and much, if not all, of the same evidence and testimony which would be used to try Zap's claims. (*Id.*)

The jury trial began on February 12, 2024. (ECF No. 138.) After Monarch rested its case but before the case was submitted to the jury, Zap's made a Rule 50 motion on all of Monarch's counterclaims. (ECF No. 150 at 147.) The Court granted Zap's motion as to Monarch's counterclaims of breach of contract and promissory estoppel based on Monarch's concession that these claims should be dismissed. (*Id.* at 151, 158.) At the conclusion of the trial, on February 14, 2024, the jury returned a verdict in favor of Zap's. (ECF No. 145.) The jury found in favor of Zap's. Specifically, the jury found that although Monarch did not breach its contract with Zap's, Zap's could recover under the theories of unjust enrichment and promissory estoppel. (*Id.*) Moreover, the jury rejected each of Monarch's counterclaims for unjust enrichment and conversion. (*Id.*)

On February 27, 2024, Zap's filed a motion for attorney's fees. (ECF No. 148.) Zap's requests attorney's fees under Nevada Revised Statute section 18.010 for fees incurred defending against Monarch's counterclaims for breach of contract and promissory estoppel and for filing the motion itself. (*Id.*; ECF No. 152.) Zap's argues section 18.010(2) supports the award of attorney's fees as to those claims because they were brought or maintained without reasonable ground. (*Id.*) Monarch opposed this motion, arguing that Zap's failed to meet its burden to support an award of attorney's fees. (ECF No. 149.)

On March 20, 2024, Zap's filed a motion to amend the judgment to include prejudgment and post-judgment interest. (ECF No. 153.) Zap's argues the Court is allowed to amend the judgment to include interest under Federal Rule of Civil Procedure 60(a) and NRS 99.040. (*Id.*) Monarch opposed the motion, arguing that the amount owed

by Monarch was not ascertainable before the litigation and that the date the payment was due is not clear. (ECF No. 154.)

The Court will discuss each of Zap's motions in turn.

## II.     MOTION FOR ATTORNEY'S FEES

### A.     Legal Standard

"In diversity actions, federal courts are required to follow state law in determining whether to allow attorneys' fees." *Swallow Ranches, Inc. v. Bidart*, 525 F.2d 995, 999 (9th Cir. 1975). Under Nevada law, a prevailing party cannot recover attorney's fees unless authorized by statute, rule, or agreement between the parties. *First Interstate Bank of Nevada v. Green*, 694 P.2d 496, 498 (Nev. 1985). Relevant here, a party can obtain an award of attorney's fees if the court finds that the action was "brought or maintained without reasonable ground." NRS § 18.010(2)(b). "The court shall liberally construe the provisions of [NRS 18.010(2)(b)] in favor of awarding attorney's fees in all appropriate situations," and "[i]t is the intent of the Legislature that the court award attorney's fees pursuant to [NRS 18.010(2)(b)] ... in all appropriate situations to punish for and deter frivolous or vexatious claims and defenses." *Id.*

Once it is established that a party is entitled to attorney's fees and costs, the court must then determine the proper amount owed to ensure the award is reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). In the Ninth Circuit, "[t]he customary method of determining fees ... is known as the lodestar method," which "is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996), *opinion amended on denial of reh'g*, 108 F.3d 981 (9th Cir. 1997); *Hensley*, 461 U.S. at 433 ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.").

Importantly, the lodestar figure enjoys a "strong presumption" of reasonableness, but it can be "enhanced or reduced in 'rare and exceptional cases.' " *Fischer v. SJB-P.D.*

*Inc*, 214 F.3d 1115, 1119 n.4 (9th Cir. 2000) (citation omitted); *Morales*, 96 F.3d 363 n.8 ("There is a strong presumption that the lodestar figure represents a reasonable fee. 'Only in rare instances should the lodestar figure be adjusted on the basis of other considerations.' " (citation omitted)). Considering that some "[c]ases may be overstaffed, and the skill and experience of lawyers vary widely," courts can exclude from the lodestar amount those hours unreasonably expended. *Hensley*, 461 U.S. at 434.

More formally, these considerations have been coined the *Kerr* factors. After calculating the lodestar figure, "the district court then assesses whether it is necessary to adjust the presumptively reasonable lodestar figure on the basis of the *Kerr* factors that are not already subsumed in the initial lodestar calculation." *Morales*, 96 F.3d at 363–64 (citing *McGrath v. Cnty. of Nevada*, 67 F.3d 248, 252 (9th Cir. 1995)). The twelve *Kerr* factors are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* at 363 n.8 (citing *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951 (1976)), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992); *see also* LR 54-14(a)(3). Ultimately, "[t]here is no precise rule or formula for making these determinations," so "[t]he court necessarily has discretion in making this equitable judgment." *Hensley*, 461 U.S. at 436–37; *see also Morales*, 96 F.3d at 362.

Additionally, Nevada courts must also review the requested amount "in light of the factors set forth in" the Supreme Court of Nevada's decision in *Brunzell v. Golden Gate National Bank*. *Haley v. Dist. Ct.*, 273 P.3d 855, 860 (Nev. 2012) (citing *Brunzell v. Golden Gate National Bank*, 455 P.2d 31, 33 (Nev. 1969)). The *Brunzell* factors include:

(1) the qualities of the advocate: his ability, his training, education, experience, professional standing, and skill;

(2) the character of the work to be done: its difficulty, its intricacy, its importance, time, and skill required, the responsibility imposed and the prominence and character of the parties where they affect the importance of the litigation;

(3) the work actually performed by the lawyer: the skill, time and attention given to the work;

(4) the result: whether the attorney was successful and what benefits were derived.

*Brunzell*, 455 P.2d at 34.

## B.   Discussion

Before the Court can decide if an attorney's fee award is appropriate, it must first determine whether Zap's is the prevailing party such that it is entitled to fees. NRS 18.010. Following that determination, the Court must calculate the lodestar amount. *Morales*, 96 F.3d 363. Finally, the Court must evaluate whether it is necessary to adjust the lodestar amount. *Fischer*, 214 F.3d at 1119 n.4 (citations omitted).

### 1.   Prevailing Party

A party prevails under NRS 18.010 for purposes of an attorney's fee award "'if it succeeds on any significant issue in litigation which achieves some of the benefit it sought in bringing suit.' " *Valley Electric Ass'n v. Overfield*, 106 P.3d 1198, 1200 (Nev. 2005) (quoting *Women's Fed. Sav. & Loan Ass'n of Cleveland v. Nevada Nat. Bank*, 623 F. Supp. 469, 470 (D. Nev. 1985)). Alternatively, "the court may make allowance for attorney's fees to a prevailing party" when it finds that the opposing party's claim was "brought or maintained without reasonable ground or to harass the prevailing party." NRS 18.010(2)(b). Such a finding, however, must be supported by evidence in the record. *Chowdry v. NVLH, Inc.*, 851 P.2d 459, 464 (Nev. 1993).

The Nevada Supreme Court expressed that "[f]or purposes of NRS 18.010(2)(b), a claim is frivolous or groundless if there is no credible evidence to support it." *Capanna v. Orth*, 134 Nev. 888, 895 (Nev. 2018) (quoting *Rodriguez v. Primadonna Co.,* 125 Nev. 578, 588, 216 P.3d 793, 800 (Nev. 2009)). The Nevada Supreme Court also established

that "there must be evidence in the record supporting the proposition that the complaint was brought without reasonable grounds or to harass the other party." *Semenza v. Caughlin Crafted Homes*, 901 P.2d 684, 687 (Nev. 1995) (quoting *Chowdhry*, 851 P.2d at 464). The fact that the claim did not prevail, or even the fact that a claim was determined to be without merit "alone is insufficient for a determination that the motion was frivolous, warranting sanctions." *Rivero v. Rivero*, 216 P.3d 213, 234 (Nev. 2009), *overruled on other grounds by Romano v. Romano,* 501 P.3d 980 (Nev. 2022). Rather, the reasonableness of the plaintiff's claims "depends on the actual circumstances of the case." *Bergmann v. Boyce*, 856 P.2d 560 (Nev. 1993), *superseded by statute on other grounds as stated in In re DISH Network Derivative Litig.*, 401 P.3d 1081, 1093 n.6 (Nev. 2017).

Zap's bases the motion for attorney's fees on its successful Rule 50 motions as to Monarch's counterclaims for breach of contract and promissory estoppel. After the presentation of evidence, but before the case is submitted to the jury, Rule 50(a) authorizes either party to move for judgment as a matter of law. Fed. R. Civ. P. 50(a).This standard largely "mirrors" the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record. *Dupree v. Younger,* 598 U.S. 729, 738 (2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251 (1986)).

Under NRS 18.010, a party prevails " if it succeeds on any significant issue in litigation which achieves some of the benefit it sought in bringing suit.' " *Valley Electric Ass'n*, 106 P.3d at 1200 (quoting *Women's Fed. Sav. & Loan Ass'n of Cleveland v. Nevada Nat. Bank*, 623 F. Supp. 469, 470 (D. Nev. 1985)). Here, the granting of a Rule 50 motion is sufficient to satisfy the requirement for a prevailing party under NRS 18.010. As Zap's is a prevailing party as defined by NRS 18.010, the Court must now determine whether Monarch's counterclaims were "brought or maintained without reasonable ground or to harass the prevailing party." NRS 18.010(2)(b).

///

### i.    Breach of Contract Counterclaim

First, the Court will address the breach of contract counterclaim. This counterclaim alleged Zap's breached a contract between the parties by failing to pay Monarch after Monarch performed under the contract. (*Id*. at 4-5.) During a hearing with the Court regarding whether the district court's order on the motions for summary judgment was the law of the case, Monarch's counsel affirmatively represented that this breach of contract claim was based on a second contract, *not* the contract at the center of Zap's breach of contract claim. (ECF No. 119.)

However, on the witness stand, Arthur Johnson ("Johnson"), principal for Monarch, testified that Monarch *does not* contend there were any contracts between Monarch and Zap's following the shutdown by the contractor's board, the period during which both contracts in question would have been formed. Johson specifically testified as follows:

Q. Does Monarch contend there was any contract between Monarch and Zap's that survived the contractor's board shutdown?

A. My position is there is no contract because it would be illegal to have that contract.

(ECF No. 150 at 104:18-22.) Zap's counsel then asked whether there were any promises made by Zap's or Brian Snow ("Snow"), principal for Zap's, which were not kept. (*Id.* at 104-105.) Johnson testified that there were discussions on February 2, 2018, with Snow which were later memorialized on paper, where the parties decided Monarch would keep 10% of the proceeds of the deal but clarified that neither the February 2nd discussion nor the paper created an actual contract. (*Id.* at 105 ("neither one of us regarded that as a contract").) Therefore, Johnson, and by extension Monarch, never actually thought there was a second, separate contract from which to base a breach of contract claim – in direct contradiction to Monarch's position pre-trial.

After Zap's made its Rule 50 motion on the breach of contract counterclaim, Monarch's counsel, Mr. Pereos, admitted that "I just have to fold my tent on that based upon [Johnson's] testimony." (ECF No. 150 at 151:3-4.) Mr. Pereos specifically

acknowledged and agreed that judgment as a matter of law should be entered on the breach of contract claim. (*Id.* at 151:5-9 ("THE COURT: Okay. So you acknowledge and agree that judgment as a matter of law should be entered on the breach of contract claim. MR. PEREOS: Yeah, I can't dispute that with the evidence.") Additionally, during questioning by Zap's counsel, Johnson seemed to indicate that the counterclaims were brought in retaliation for Zap's bringing its underlying suit, based on the following:

> Q. So it was in retaliation for you being sued for the 10 percent that you pocketed that you brought these counterclaims for all these amounts that we're talking about right here; is that correct?
>
> A. That's the way lawsuits work, isn't it? There's claims and counterclaims.

(ECF No. 150 at 112-113.)

Monarch argues it would be unfair to punish Monarch based upon the testimony of Johnson, "a layman," who cannot be held to know "the various distinctions that the law places on the phrase 'agreement.' " (ECF No. 149 at 2.) The Court disagrees. Johnson is licensed in the state of Nevada as a contractor and Monarch, the company for which he is the principal, has at least seven or eight licenses. (ECF No. 150 at 49:7-11, 82:14-16.) The definition of "contractor" is "one that contracts or is party to a contract: such as. . . one that contracts to perform work or provide supplies [or] one that contracts to erect buildings." *Contractor*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/contractor. (last visited Apr.12, 2024). It is illogical to argue that a contractor whose job it is to enter contracts to perform work does not know how to determine what is or is not a contract. The argument that the actions of Johnson should not impact Monarch also fails as even Johnson frequently conflated himself and Monarch by answering questions in the first person when asked about Monarch. (*See, e.g.,* ECF No. 150 at 104:18-22 (when asked a question about Monarch's position, Johnson responded with *his* position.)

Despite Monarch's counsel's repeated assertions that there was a second contract, at trial, it became clear that his client did not believe there were *any* contracts,

let alone a *second* contract that existed between the parties to for the basis of the breach of contract counterclaim. Thus, by Monarch's counsel's own admission, the counterclaim based on breach of contract is not grounded in fact at all. (ECF No. 150 at 151.) The Court can discern no reason for the circumstances to change between the filing of the counterclaims, the calendar call, and Johnson's testimony at trial such that it was at one time reasonable to raise the breach of contract counterclaim. At the very least, Monarch and Monarch's counsel at the very least should have known that there was no factual basis for the breach of contract counterclaim because Johnson confirmed – on multiple occasions – he did not believe a contract existed. These facts, combined with Johnson's indication that he would not have brought the counterclaims had he not been sued, is sufficient to show the breach of contract claim was "brought or maintained without reasonable ground or to harass the prevailing party." NRS 18.010(2)(b). Therefore, an award of attorney's fees for Zap's is proper based on the breach of contract counterclaim by Monarch. NRS 18.010(2)(b); *Muney v. Arnould*, 524 P.3d 491, at *5 (Nev. 2023) (holding the district court did not abuse its discretion in awarding attorney fees under NRS 18.010(2)(b) because the Court found the defendant's defenses and counterclaims were groundless as the defendant could not proffer admissible evidence on the claims at summary judgment).

### ii.    Promissory Estoppel Counterclaim

Turning to the promissory estoppel counterclaim, during the Rule 50 motion, Zap's argued it was entitled to judgment as a matter of law due to "Monarch's counsel's inability to identify a 'promise' to support the claim or to otherwise articulate any coherent theory to support it." (ECF No. 148 at 5.) After Monarch was allowed to respond to the motion, the Court also expressed confusion about Monarch's promissory estoppel counterclaim and noted that the basis of the claim seems to have shifted:

> I don't believe that you can maintain a claim for promissory estoppel based on what you just described. I'm very confused now about what the basis of your claim is as it relates to that. This is different than I think you've articulated it in the past on several occasions, and very different than even

1   what I think your client testified to.

2   (ECF No. 150 at 156:12-16.) Monarch was allowed another opportunity to explain the

3   basis for the promissory estoppel claim. However, the explanation was again confusing

4   and different than previous iterations, prompting the Court to give Zap's another

5   opportunity to argue its Rule 50 motion because the nature of the claim had again shifted.

6   (*Id.* at 157:3-9 ("But the promissory estoppel claim, I'm very confused, Mr. Pereos. I have

7   to be just very honest with you, I'm just not following what you're arguing. I'm actually

8   going to ask [counsel for Zap's] one more time if maybe he can articulate what [his]

9   response is to that. . .").

10          Ultimately, Monarch's counsel again admitted that the evidence does not

11   substantiate the claim for promissory estoppel. (ECF No. 150 at 158:3-4 ("I would agree

12   that the evidence does not substantiate the claim for promissory estoppel.") When

13   counsel for a party cannot sufficiently articulate the basis for its claim *at trial*, even after

14   being given repeated opportunities to explain, the claim was clearly "brought or

15   maintained without reasonable ground." NRS 18.010(2)(b). This conclusion is further

16   strengthened by Johnson's indication that he would not have brought the counterclaims

17   had he not been sued. (ECF No. 150 at 112-113.) Therefore, an award of attorney's fees

18   for Zap's is proper based on the promissory estoppel counterclaim by Monarch. NRS

19   18.010(2)(b); *Muney*, 524 P.3d at *5.

20                      **2.      Lodestar Calculation**

21          After establishing that Zap's is entitled to attorney's fees on both counterclaims,

22   the Court must determine the proper amount owed to ensure the award is

23   reasonable. *Hensley*, 461 U.S. 424, 433–34. Zap's requests $44,452.37 in attorney's fees

24   based on the two counterclaims Monarch "brought and maintained without reasonable

25   ground." (ECF No. 148.)[2] In the Ninth Circuit, "[t]he customary method of determining

26   _____

27   [2]      In the reply to the motion for attorney's fees, Zap's increased the requested
amount to a total of $52,736.37 to include $8,248.00 in fees incurred in bringing the

28   motion itself. (ECF No. 152.) However, as to the additional $8,248.00 in fees, the Court

fees ... is known as the lodestar method," which "is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales*, 96 F.3d at 363; *Hensley*, 461 U.S. at 433 ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.").

### i.    Reasonable Hourly Rate

"[W]hen determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Courts look to "evidence supporting the hours worked and rates claimed" to determine whether the number of hours expended were reasonable. *Hensley*, 461 U.S. at 433. In 2018, the following rates were approved within this district: an hourly rate of $450 per hour for a lawyer with over 30-years of experience; a rate of $375 for an attorney with 19 years of experience; and a rate of $275 for an attorney with 9 years of experience. *Leverty & Assoc. v. Exley*, No. 3:17-cv-00175-MMD-WGC, 2018 WL 6728415 (D. Nev. Nov. 5, 2018), report and recommendation adopted in 2019 WL 913096 (D. Nev. Feb. 22, 2019).

Subsequently, the hourly rate of $500 has been approved for attorneys with between 18-30 years of experience. *Newmark Group, Inc. v. Avison Young*, No. 2:15-cv-00531-RFB-EJY, 2022 WL 990640 (D. Nev. Apr. 1, 2022); *Leftenant v. Blackmon*, No. 2:18-cv-01948-EJY, 2022 WL 605344 (D. Nev. Feb. 28, 2022). Rates of $450-$500 per hour have been recently approved for attorneys with 13-21 years of experience. *Newmark Group, Inc. v. Avison Young*, No. 2:15-cv-00531-RFB-EJY, 2022 WL 990640 (D. Nev. Apr. 1, 2022); *Buck v. Lakeview Mediation Solutions*, No. 2:20-cv-00189-GMN-BNW,

---

declines to grant the request. NRS 18.010(2)(b) gives discretion to courts in allowing attorney's fees, although the statute mandates fees be awarded "in all appropriate situations to punish for and deter frivolous or vexatious claims and defenses. . ." The Court is satisfied that the imposition of attorney's fees for the two counterclaims is alone sufficient to achieve NRS 18.010(2)(b)'s purpose of deterring such claims. Thus, allowing additional fees based on the preparation of the motion for attorney's fees is not necessary under NRS 18.010(2)(b) and the Court declines to exercise its discretion to impose the additional fees.

2021 WL 5176472, at *6 (D. Nev. Oct. 19, 2021); *McGuire v. Allegro Acceptance Corp.*, No. 2:18-cv-01635-MMD-VCF, 2020 WL 3432533, at *4 (D. Nev. June 22, 2020). The hourly rate of $225 for an associate has been approved. *Dentino v. Moiharwin Diversified Corp.*, No. 2:16-cv-904, 2017 WL 187146 at *2-3 (D. Nev. Jan. 17, 2017) (granting fees at $350 per hour for a partner and $225 for an associate.)

Mr. Tasca, lead counsel for Zap's, is a litigation partner at Ballard Spahr and graduated from law school in 1997. (ECF No. 148-1.) Mr. Dagher is an associate at Ballard Spahr and graduated from law school in 2019. (*Id.*) Ms. Coles, Mr. Clark, and Mr. Sakai were all associates at Ballard Spahr and graduated from law school in 2022, 2018, and 2014, respectively. (*Id.*)

Based on the awards previously allowed within the District of Nevada and the Court's familiarity with prevailing rates in this community, the Court finds the following to be reasonable hourly rates:[3]

| Name | Hourly Rate | Experience as of 2024[4] |
|------|-------------|--------------------------|
| Joel Tasca, Esq. | $395.00 | 27 years |
| Joseph Dagher, Esq. | $275.00 | 5 years |
| Joseph Sakai, Esq. | $275.00 | 10 years |
| Madeline Coles, Esq. | $275.00 | 2 years |
| Andrew Clark, Esq. | $275.00 | 6 years |

### ii.   Hours Reasonably Expended

The Court must next consider the hours expended on the tasks outlined in Mr. Tasca's declaration. The party seeking an award of fees must submit evidence supporting the hours worked. *Hensley*, 461 U.S. at 433. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* The Court should

---

[3]   Monarch did not object to the reasonableness of the hourly rates charged by Zap's counsel. (*See* ECF No. 149.)

[4]   As Zap's does not include the amount of experience each attorney has, the Court will assume that each attorney began the practice of law during the same calendar year as their graduation from law school.

exclude from the initial fee calculation hours that are not reasonably expended. *Id.* at 433-34. Using the lodestar approach, courts may exclude such hours using one of two methods. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). "First, the court may conduct an 'hour-by-hour analysis of the fee request,' and exclude those hours for which it would be unreasonable to compensate the prevailing party." *Id.* Second, the court may "make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of excluding non-compensable hours from a fee application." *Id.* (internal quotation marks omitted). "[W]hen a district court decides that a percentage cut (to either the lodestar or the number of hours) is warranted, it must 'set forth a concise but clear explanation of its reasons for choosing a given percentage reduction.' " *Id.*

Zap's represents that it incurred over $140,000 in legal fees in the action, although it only requests a portion of that amount. (ECF No. 148 at 5.) Zap's seeks a total of $44,452.37 based on defending against the two counterclaims. (*Id.*) This number is calculated based on two categories of fees: (1) hours spent purely defending against Monarch's counterclaims; and (2) hours spent on "mixed" tasks that involved prosecuting Zap's own claims or defending against Monarch's counterclaims "as a whole." (*Id.* at 5-7.) Each category will be discussed in turn.

### a.  Hours Purely Defending Counterclaims

First, Zap's seeks 50% of its fees for work performed "purely in connection with defending these two counterclaims." (ECF No. 148-1 at 2.) Mr. Tasca provides the dates that the attorneys provided legal services in connection with defending all four counterclaims, a summary of work performed for each entry, and the time spent on each task. (ECF No. 148-2.) According to Mr. Tasca's declaration, the attorneys involved spent 27.9 hours purely in connection with defending the counterclaims, and when reduced by half, 13.95 hours. (ECF No. 148-1 at 3.) Therefore, Zap's asserts it is entitled to $3,900.25 based on fees associated only with defending against the counterclaims. (*Id.*)

Monarch objects to this amount by arguing that some of the line items provided

show duplication regarding work in connection with experts and the summary judgment motion and that the 50% amount does not take into consideration the significance of each claim. (ECF No. 149 at 15.) Regarding the argument that work was duplicated, the Court does not agree. It is not abnormal to have a document or report reviewed by multiple attorneys for editing and to assure accuracy, nor is it unusual to have the same attorney revisit a document they had previously written or reviewed.

Additionally, although Zap's does not request more than 50% as to this category of fees, the Court agrees with Zap's position that the two counterclaims upon which it prevailed were more time consuming than the remaining two claims. As discussed above, even after completing the prosecution of the counterclaims, Monarch's counsel could not adequately articulate the promissory estoppel claim and conceded the Rule 50 motion. (ECF No. 150 at 156:12-16, 158:3-4.) Based on this, Zap's could have reasonably requested more than 50% for this category of fees.

However, as to this category of fees, the Court is satisfied with the estimate that the attorneys for Zap's spent 50% of the time defending against all counterclaims on two out of the four total counterclaims. Based on the Court's experience, the Court finds that 13.95 hours spent defending against two counterclaims, in connection with the second category of fees discussed below, is a reasonable amount.

Thus, the following fee computation applies for the first set of fees:

| Name | Hourly Rate | Hours | Fees |
|------|-------------|-------|------|
| Joel Tasca, Esq. | $395.00 | 3.2 | $1,264.00[5] |
| Joseph Dagher, Esq. | $275.00 | 4.25 | $1,168.75 |
| Joseph Sakai, Esq. | $275.00 | 2.95 | $811.25 |
| Madeline Coles, Esq. | $275.00 | 3.55 | $976.25 |
| | | **TOTAL:** | $4,220.25 |

---

[5]    This amount differs from the amount provided in Mr. Tasca's declaration, however, $1,264.00 is the correct calculation based on the hours worked and hourly rate. (ECF No. 148-1 at 3.)

### b.     Hours Spent on "Mixed" Work

Next, Zap's requests 35% of fees for hours spent on "mixed" work that involved prosecuting Zap's own claims or defending against Monarch's counterclaims "as a whole." (ECF No. 148 at 6-7.) Zap's explains the basis for requesting 35% as follows:

> [There were] seven claims total in the case – three claims by Zap's, and four counterclaims by Monarch. The two counterclaims on which Zap's obtained judgment as a matter of law comprise roughly 29% of the seven total claims. However, Zap's has included a modest premium – making the percentage requested 35% – because Zap's counsel ended up spending more time on the two counterclaims on which Zap;s (sic) obtained judgment as a matter of law than on other aspects of the case. The reason more time was spent on these claims is because they were so vaguely and cryptically pled and litigated by Monarch throughout the case, causing Zap's to have to prepare to defend against multiple possible legal and factual theories that Monarch might advance at trial to support these claims. In the end, Monarch had *no* theory and *no* evidence to support these claims, and preparing to defend against them was nothing but a waste of time for Zap's.

(ECF No. 148 at 6; ECF No. 148-1 at 3-4 (emphasis original).)

Monarch argues that 35% of the mixed tasks is not reasonable because most of the work Zap's completed on "mixed" tasks was primarily for the purpose of litigating their claims, not defending against Monarch's counterclaims. (ECF No. 149 at 16- 18.) Monarch argues the amount should be "25% at most" based on the discovery conducted in this case, (*Id.* at 17), but later argues that the total percentage should be 15% (*Id.* at 18.) Additionally, Monarch argues that because there were no jury instructions by Zap's which would have addressed any of the dismissed claims that were not also being advanced by Zap's case in chief and thus there was no extra work. (*Id.* at 17.) However, the fact that Zap's was bringing the same cause of action does not mean that no extra work was necessary to craft any jury instructions *defending* against Monarch's counterclaims. As noted above, especially in relation to the promissory estoppel claim, it was unclear as to exactly what the nature of the claim was and therefore it is reasonable was needed so Zap's would be prepared for whatever the claim ultimately became. Moreover, after granting Zap's Rule 50 motions, the Court explicitly stated, "we need to

go back through [the jury instructions] and delete jury instructions related to any kind of claims for promissory estoppel particularly." (ECF No. 150 at 158:12-14.) It is therefore entirely irrelevant to base this argument on what was ultimately provided to the jury because the Court removed any jury instructions which were related to Monarch's counterclaims for breach of contract and promissory estoppel *before* they were given to the jury.

Mr. Tasca provides the dates that the attorneys provided legal services in connection with defending all four counterclaims, a summary of work performed for each entry, and the time spent on each task. (ECF No. 148-2.) According to Mr. Tasca's declaration, the attorneys involved spent 380.7 hours on "mixed" tasks – i.e., for work that involved prosecuting Zap's own claims, and/or defending Monarch's counterclaims. (ECF No. 148-1 at 3.) When reduced by 65%, the total is 133.245 hours. (*Id.*) Therefore, Zap's asserts it is entitled to $40,552.12. (*Id.*) Based on the Court's experience, the Court finds that 133.245 hours spent over the course of the entire case, including dispositive motions, additional briefing requested by the Court, pretrial preparations, and the jury trial itself, is a reasonable amount to defend against two counterclaims. The Court also notes that the 6% premium added to the 29% amount based on the number of claims and counterclaims is reasonable because of the vagueness of the counterclaims which ultimately were not supported by evidence and required additional briefing and preparations to defend against. Thus, based on this Court's determination of reasonable hourly rates and hours reasonably expended, the following fee computation applies for the second set of fees:

| Name | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Joel Tasca, Esq. | $395.00 | 32.585 | $12,871.075 |
| Joseph Dagher, Esq. | $275.00 | 57.645 | $15,852.375 |
| Joseph Sakai, Esq. | $275.00 | 29.82 | $8,200.05 |
| Andrew Clark, Esq. | $275.00 | 13.195 | $3,628.625 |
| | | **TOTAL:** | $40,552.12 |

### iii.    Reasonableness of Lodestar Amount

Having considered the hourly rate and the legal services itemized in Mr. Tasca's declaration, the final step of the analysis is evaluating whether it is necessary to adjust the lodestar amount. *Fischer*, 214 F.3d at 1119 n.4 (citations omitted). Here, the Court must decide whether to increase or reduce the lodestar amount based upon the *Kerr* factors not already included in the initial lodestar calculation. *Fischer*, 214 F.3d 1115, 1119. The Court must also evaluate the *Brunzell* factors. *Haley*, 273 P.3d at 860.

Combining both categories of requested attorney's fees, the total amount of fees is $44,452.37. This amount is also consistent with, if not lower than, awards of attorney's fees by other courts in this district. For example, another court in this district granted $106,140 in attorneys' fees in a case that was litigated over a three-day, non-jury trial over a single breach of contract claim, a court in this district awarded $106,140 in attorney's fees. *Pleasant v. State Farm Fire & Cas. Co.*, No. 2:16-cv-01977-JAD-BNW, 2020 WL 4572316 at *3, (D. Nev. Aug. 7, 2020). The present case was litigated over the same number of days before a jury and the instant attorney's fees motion is based on a breach of contract counterclaim *and* a promissory estoppel claim. However, because many expenses would have been incurred regardless of the dismissal of the two counterclaims, an award of $44,452.37 is reasonable.

The Court has also considered all the relevant factors and finds that no other *Kerr* factors or *Brunzell* factors warrant enhancement or reduction of the fees. The Court further finds that there are no exceptional circumstances in this case warranting a reduction of this presumptively reasonable lodestar figure. *See Pennsylvania*, 478 U.S. at 565. Therefore, based on the discussion above, Defendants are entitled to recover $44,452.37 in attorney's fees.

### III.    MOTION TO AMEND JUDGMENT

#### A.    Legal Standard

For federal cases sitting in diversity, "state law determines the rate of prejudgment interest ...." *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1107 (9th

Cir. 1998). Under Nevada law, the amount of prejudgment interest is based on (1) "the rate of interest," (2) "the time when it commences to run," and (3) "the amount of money to which the rate of interest must be applied." *Nautilus Ins. Co. v. Access Med., LLC*, No. 2:15-cv-00321-JAD-BNW, 2023 WL 2663205 at *2, (D. Nev. Mar. 28, 2023) (quoting *Kerala Properties, Inc. v. Familian,* 137 P.3d 1146, 1147 (Nev.2006) (cleaned up)). NRS 99.040 is the statute that governs prejudgment interest in contract cases in Nevada. *Kerala,* 137 P.3d at 1147. Section 99.040 provides, in pertinent part, that:

> When there is no express contract in writing fixing a different rate of interest, interest must be allowed at a rate equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1 or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due, in the following cases: . . .

> > (c) Upon money received to the use and benefit of another and detained without his or her consent.

NRS 99.040(1). The interest runs from the date the obligation became due. *See Kerala,* 137 P.3d at 1149; NRS 99.040(1).

Under 28 U.S.C. § 1961  "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Post-judgment interest is calculated from the date the judgment is entered and is equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment. 28 U.S.C. § 1961(a). Interest is calculated daily on all remaining amounts until the award is paid off. 28 U.S.C. § 1961(b).

## B.    Discussion

First, the Court will address Zap's request for prejudgment interest. Monarch argues Zap's is not entitled to prejudgment interest because there is not a specific amount that can be clearly defined as being owed to Zap's nor is there evidence showing the date the obligation became due. (ECF No. 154.) Prejudgment interest cannot be awarded on any portion of the judgment that is not a "definite sum of money," "ascertainable by mathematical calculation from a standard fixed in the contract or from established market

prices of the subject matter" at the time they became due. *Kerala*, 137 P.3d at 1150.

Consistently throughout the litigation and especially at trial, Zap's maintained that the agreement was for Monarch to pay Zap's 100% of the contract proceeds for the El Dorado project, which is why so much of the witness testimony was based on how Monarch concluded that they should retain 10% of the proceeds. (*See, e.g.*, ECF No. 150 at 105 ("So you thought that you would get ten -- you believed you were to get 10 percent of the El Dorado contract based on that February 2nd discussion.") Additionally, Zap's maintained the position they were due about $90,000 throughout the litigation. (*See* ECF No. 155-1 (demand letter dated January 16, 2019, requesting $90,996.00); ECF No. 150 at 143 ("So once you were done with everything, he decided to stiff you of $90,000."); ECF No. 59 at 16 (Zap's motion for summary judgment requesting $90,996.70.)

The jury found that "Zap's justifiably relied on Monarch's promise to Zap's detriment such that Monarch should be estopped from retaining the benefits promised to Zap's" in the amount of $90,565.57, the same amount Monarch's spreadsheet identifies as the balance from the project. (ECF No. 145; ECF No. 153-1 at 5.)[6] $90,565.57 is the amount Zap's requested minus $431.13 based on line items on Monarch's spreadsheet for certain prorations for $401.13 and a $30 wire fee. (ECF No. 153-1.) A review of the spreadsheet shows that the balance refers to the amount remaining after subtracting the total expenses of the project from the total amount received for the project. (*See id.*) The "balance" therefore refers to the profit from the project. The logical inference is that the jury found Zap's was owed 100% of the proceeds from the project and consequently found that Zap's was due the $90,565.57 which had been retained by Monarch. All of this supports the finding that the amount owed was known and ascertainable throughout the litigation. Therefore, the question becomes when Monarch was obligated to pay Zap's the proceeds of the project.

---

[6] The jury also found that Zap's succeeded on its unjust enrichment claim for the same amount in damages. (ECF No. 145.) For brevity, the Court will only discuss the promissory estoppel claim.

In *M.C. Multi-Family Development, L.L.C. v. Crestdale Assocs., Ltd.*, the Nevada Supreme Court found that the amount of money due under the contract was not definite or ascertainable until judgment was rendered because the contract involved consulting services with no set duration, to be compensated based on profits. 193 P.3d 536, 541 (Nev. 2008). This case is distinct from *M.C. Multi-Family Development* because the amount of money owed was able to be calculated once the project was completed and all payments to suppliers or workers had been deducted from the total amount paid by the general contractor.

Originally, Zap's argued the date the obligation became due was July 31, 2018. (ECF No. 153 at 4.) Subsequently, "following a closer look at the evidence, particularly Monarch's spreadsheet for the El Dorado project," Zap's argued the funds became due on September 5, 2018, at the very latest. (ECF No. 155 at 3.) This date is based on the last payroll payment Monarch made for the project, which can be identified on Monarch's spreadsheet of costs related to the El Dorado project from 2018. (ECF No. 153-1 at 5.) That payroll payment represents the last expenditure on the spreadsheet for actual construction related costs. (*See* ECF No. 153-1.) According to testimony at the trial, all work had been completed on the El Dorado project by September of 2018. (ECF No. 150 at 143.)

Monarch argues there is no evidence as to when Monarch received the money from the general contractor, Digney York, and that construction was not finalized until December of 2018. (ECF No. 154 at 5.) However, based on Monarch's spreadsheet, which was provided by Monarch during discovery and at trial, the final payment to Monarch from Digney York for the El Dorado project was on December 31, 2018. (ECF No. 153-1 at 5.) The Court finds that because the jury found there was a deal based on the proceeds of the El Dorado project, the obligation was not due until Monarch had received the full amount from the general contractor, December 31, 2018.

On July 1, 2018, the prime rate was 5.00%.[7] Based on NRS 99.040(1), the prejudgment interest rate is the prime rate plus 2%, and therefore under the rate of prejudgment interest is 7.00%. This amounts to a per diem rate of $17.37. As the interest clock started on December 31, 2018, and judgment was entered on February 16, 2024, the prejudgment interest accrued for 1,873 days. (ECF No. 146.) The per diem rate multiplied by 1,873 days amounts to a total prejudgment interest of $32,534.01.

Finally, the Court turns to Zap's request for post-judgment interest. As noted in Zap's reply to their motion to amend the judgment, Monarch does not address Zap's request for post-judgment interest. (ECF No. 155 at 1; *see generally* ECF No. 154.) Thus, the Court finds Monarch does not oppose Zap's request and therefore Zap's is entitled post-judgment interest until the amount is paid in full. 28 U.S.C. § 1961 ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

///

///

///

///

///

///

///

///

///

///

---

[7]     Nevada Financial Institutions Division, Prime Interest Rate, https://fid.nv.gov/uploadedFiles/fidnvgov/content/Resources/Prime%20Interest%20Rate%20January%201,%202024.pdf (last visited April 12, 2024).

IV.     **CONCLUSION**

**IT IS THEREFORE ORDERED** that Zap's motion for attorney's fees, (ECF No. 148), is **GRANTED**.

**IT IS FURTHER ORDERED** that Zap's is awarded the sum of $44,452.37 in attorney's fees payable to Plaintiff's counsel within **60 days** of the date of this order.

**IT IS FURTHER ORDERED** that Zap's motion to amend the judgment, (ECF No. 153), is **GRANTED**.

The Clerk of Court is directed to **AMEND THE JUDGMENT** in favor of Zap's to include the prejudgment interest in the amount of $ 32,534.01 against Monarch, with the amount accruing post-judgment interest until the amount is paid in full.

**IT IS SO ORDERED.**

**DATED**:  April 18, 2024  .

**UNITED STATES MAGISTRATE JUDGE**